You want to make a little announcement of the extent of the secrecy? Because, you know, I've never been involved in a secret proceeding. And, um, yes, a lot of people here. Good morning, Your Honors. Uh, Stephen Mansfield for Appellant Metabolite International. I'd like to point out the council table, uh, I have with me from my firm, uh, Michael Small and Robert Humphreys. And as the court requested, we are here, uh, in a closed courtroom today, because this matter relates to, uh, a grand jury investigation conducted out of the Southern District of, uh, uh, California. And so the matters relate to, uh, that grand jury investigation and the court has, uh, uh, granted the parties a joint motion to, uh, keep the appellate argument. Okay. And what are the obligations as you see them of the people that were here today, except the court? Well, I, I think I would have to leave to the government what their view of that is, um, I think that, uh, I understand it in the courtroom. That's right. You got a white shirt on. I thought you were with the government. Your Honor, for 11 wonderful years, I served as an AUSA, but I'm no longer with the government. Did you, did you receive, did you receive only the redacted brief from the government? Yes, Your Honor. I have received no information that was submitted in camera, uh, under seal and have no idea what the government is arguing or submitting. You did receive, you did receive a copy of Judge Gonzales's, um, order, which is filed under seal. Yes, Your Honor. Okay. So that you have seen. Yes, Your Honor. Okay. We'll have to rely on the government to tell us if we've inadvertently strayed into the redacted, to the non-redacted brief. Was somebody going to shush us if, if, if we, uh, all right. I may hear something I've never heard before, so I could probably help in that regard. I have no idea what these facts are that they claim to have. Maybe you could restore his time. All right. You're now restored. Thank you, Your Honor. Um, may it please the court. This appeal involves an unprecedented prosecution of political speech in an APA comment period. Never before in the 60 year history of the APA or the false statement statute has such a prosecution been attempted until now. A prosecutor in San Diego is attempting to prosecute political advocacy critical of an agency's proposed rule. What started out as a criminal tax investigation before the grand jury has veered off course and on this issue is out of bounds and it's out of bounds because the first amendment bars the government from monitoring public policy debates, selecting and branding certain speeches false and seeking to incarcerate the speaker. We rely on the crucible of debate in resolving public policy issues, issues relating to the government's proposed changes in law. We don't resort to grand jury investigations to determine what is good and sound public policy and what laws should be enacted. That's part of our profound national commitment to wide open, robust, uninhibited debate, and we don't stand alone on this issue. Okay. The United States Congress agrees. Excuse me. What's the question of debate here though? The, the, the statements that, uh, that your client has made to the government, uh, are according to the government demonstrably false and were designed to mislead the FDA. These were not matters of political opinion. They were, they were not matters. They were not matters of, it would be a bad idea to regulate this, or it'd be a good idea to regulate that, or the rule ought to look like this. Nobody's being punished for that. Well, two points, Your Honor. First, there is no showing or finding of knowing falsity in any speech in this case, what we have is the government's suspicion that certain speech is false. That's all we have. It's never been proven. There's been no finding by a jury or judge or any other recognized body. It's a suspicion of falsity.  But don't we have to accept, don't we have to accept that allegation? In other words, the question is, can they prosecute, um, under this statute, statements to the FDA, which are allegedly knowingly false? And you say no, because any, any communication with the FDA is political speech. It's, it is political speech, Your Honor. It's pure political speech and subject to the most heightened protection. What's political about it, though? Yes. And that, that was the other point that, that Your Honor raised I wanted to respond to. It's political because it's part of a comment submitted to an agency relating to a proposed regulation by the agency. The Supreme Court in the Riley decision made clear that it's not appropriate for courts to, uh, parse out certain sentences that are part of political advocacy and brand them unprotected speech and other parts protected speech, um, because it's, it's impossible to separate what are really inextricably intertwined communications in support of a political position. And that's precisely what we have here. We have comments being submitted to an agency that are frankly opposed to the regulation. Um, and they're opposed on a number of grounds and the statements. In the letters, uh, uh, didn't your client, uh, state or disclaim having ever received a claim from a consumer challenging, challenging the safety of the product or a report of adverse effect associated with a product's use? Your client wrote such letters. Am I wrong about that? The client wrote letters that contain some of those words and they're in different iterations in various letters. That's true. There is no showing. But is that, but is, is such a statement true or false? Well, at this point, at this point, they never received a claim from a consumer challenging the safety of this product or a report of an adverse effect associated with the product's use. Is that true or false? We, Your Honor, there, there is no determination by a court or jury as to the truth or falsity of the statement. As far as I understand, I do not have the in-camera submission, but there's no evidence of what the speaker intended by the statement and the words in each of the statements that are challenged by the government. There are words in each of those statements that are fundamentally ambiguous. For example, the word serious. The GAO report in Exhibit Excerpt of Record 0008 explicitly found that the word serious, which finds its way into all of these letters, is undefined, imprecise, and subject to a variety of subjective opinions. And what the GAO was discussing in that regard was the fact that these medical experts and scientists that the government employed to. That's true of many, many, many, many words and language. Yes, and when it's true with respect to words that are to be the subject of a false statement prosecution, it cannot stand. If the words are fundamentally ambiguous, no false statement prosecution can result. But before we get to the words, and I'm at a disability since I have no idea what the There's a fundamental threshold issue here about whether the government can constitutionally prosecute political speech in an APA comment period for falsity without first demonstrating, according to the constitutional standard for political speech, an overriding, compelling justification, and that this is the least restrictive means employed to do it. And the government failed to demonstrate any overriding or compelling justification. They made the record. That assumes that the first that the First Amendment kicks in here. I mean, the analogy that I first thought of when I heard your argument was the Knorr-Pennington Doctrine in the antitrust context. And I noticed I think you cited someone may have cited the Knorr case. But if you go back and you look at that, and that's where you basically have, in effect, lobbying activity to the government that could end up in something that would be an in a competitive situation for your client. But the Supreme Court, of course, said you get a free skate on that one. Right. And that's the only quasi-analogous circumstance I can think of, but I don't think it really flies because they didn't base that on the First Amendment. And you they said, of course, we have other rules that under which you can be prosecuted for false statements. So that then brings me back to two questions. One, why would, you know, that antitrust type immunity apply here? And two, Knorr-Pennington says there's other rules. And the rule we have is Section 1001, which on its face basically permits the prosecution. I don't think we have our role isn't to decide whether your client did or didn't make a knowingly false statement. That's just the allegation. And you're saying you can't prosecute that allegation, and they're saying you can. So that's all we need to know about the facts, I think. Yes, Your Honor. But I'm still having trouble understanding how it comes under First Amendment rubric as political speech, given the nature of the allegation. Well, Your Honor, as this Court in Clipper Express held, when an agency is operating in a political sphere as opposed to an adjudicatory sphere, First Amendment rights are implicated, rights to petition the government and rights to criticize the government with respect to its policies or, in this case, a proposed law. Why was this a legislative sphere rather than an adjudicatory sphere? Simply because it was a rulemaking proceeding as opposed to an adjudicatory proceeding? Yes. That's a very key distinction. Was this a proceeding under Section 553 of the APA? It's under the Administrative Procedure Act. I'm not sure of the... I looked at the notice and I didn't see the APA referred to, and the reason was because I believe they proceeded directly under the process of the Food, Drug, and Cosmetic Act. Now, the Food, Drug, and Cosmetic Act, I'm looking at 21 U.S.C. Section 371, provides the process by which the FDA will issue a rule. And that process is very close to formal rulemaking, which is as close as we get in any context to having formal trial-like procedures, the end result of which is a rule. And the FDA is one of the few agencies known for conducting formal rulemaking. Now, why would that be different from, why would we even draw the distinction between legislative and adjudicatory process here? Because I think it is the key distinction, Your Honor. This is not an adjudicatory setting in which these statements are made. Whether it is under this FDA statute or the APA statute, those are statutory structures that allow citizens to comment and exercise their First Amendment rights to petition the government and criticize proposed government action. That's the key. Alitoson Would it make a difference if they were placed under oath? Well, I think that's an interesting question, because, and that highlights how this is not an adjudicatory setting, because these were not statements placed under oath. There was an invitation for public comment. There were 15,000 comments received. That's not like an adjudicatory proceeding. 15,000 comments from all different speakers. And they were unsworn. But, and the question of whether or not it would make a difference, I think it does suggest a different context when statements are presented in a sworn manner. But these were unsworn comments. Citizens invited to comment and participate, and they did. In the FDA's Organic Act, once they've received comments, any party can request a hearing at which interested parties may come and testify. Now, if you came and testified, would it make a difference whether you were put under oath? Let's suppose that we had somebody from your client who requested the opportunity of coming and testifying before the FDA, and they uttered the same statements. They repeat them word for word what's found in their written comments. Well, I think that is not our case. And if a citizen has to go, if it is not the case that any of the statements were placed under oath and were sworn, that's not the case here. These are unsworn statements responding to a government invitation to comment about public policy, whether a law should be enacted. But if a citizen presented a sworn. Let's say the statements were not under oath. Then you want to comment on that? You still intended for the FDA to rely on them, right? I think every speaker shares comments for the purpose that they'll be relied upon. I think that's the purpose of submitting the comment. The point is, what power does the government have to punish or restrict people based on the government's belief that those statements are knowingly false? That's the question. And we have a constitutional balance between First Amendment rights that are implicated based on the regulation and punishment of the content of political speech with respect to a proposed change in law versus the government's interest in addressing falsity in speech to the government. And the rules, the constitutional rules are set forth. The government can't. I'm still having trouble. And maybe it's because you keep, we have to accept your premise that it's political speech. But even if it were, you know, the First Amendment is not unbridled. And you keep saying, well, what right do they have? Well, they can prosecute. They may not win. But it seems to me that a knowing falsehood is not an unreasonable intrusion into the First Amendment in the context of a public interest situation. I mean, look at election law and everything else. So why, so if I just take your premise that it's political speech, that doesn't mean that it's unbridled. Well, first the question is, what's the way in which our First Amendment body of case law addresses political speech that may be false or misleading? And the answer from the case law is it's the crucible of debate. We don't turn to criminal prosecutions. This Court in Clipper Express said that very clearly. But almost the more important issue, Your Honor, with respect to your question, is if it's knowingly false, then why is there a problem? There's no finding of knowing falsity. We don't know what the speaker intended by words the GAO determined were ambiguous. We don't know. And that's the problem. The problem is there are First Amendment issues that immediately begin when prosecutors are granted the power to begin selected grand jury investigations against certain speakers because they may be wrong. No, no, stop, stop. That's your argument to the jury, isn't it? I mean, what you want to do is you want to shut it off so it could never be prosecuted at all. And it seems to me that to say that someone could, you know, your clients may not be guilty because they didn't knowingly misrepresent. I mean, this is knowing falsehoods here. I don't know. But you're simply saying you can't even prosecute them for that. And that's where I'm having trouble understanding what precedent there is given the clear language of this statute that a knowing falsehood can actually go forward. Your Honor, if there's a finding. What's the best case that I should look at? I think the best case is Clipper Express, which talks about the fact that agencies act in a political sphere and we don't turn to criminal prosecutions to decide matters of political speech. But I also believe that the statute, while it does not explicitly carve out false statement prosecutions for administrative agencies, it leaves a very dangerous and unacceptable anomaly because it would allow, if the government's argument is believed, the same speech communicated to Congress with respect to its lawmaking function could not be prosecuted. And that same very speech communicated to an agency with respect to its rulemaking process could be prosecuted. But Congress made that judgment. This isn't even one of those things where you sort of say, hmm, I wonder if by the clear legislative congressional exception, they somehow forgot to include, for example, administrative. But the statute is so clear, I can't even conjure up that argument. So doesn't that suggest to you that the plain language of the statute says that it doesn't involve executive proceedings as well? No, Your Honor. I think that, frankly, the legislative history, which talks about the First Amendment rights, Congress would Do I go there if the statute is clear, according to the Supreme Court? Well, I think it shows what the government's purpose was in respect to the carve-out for false statement prosecutions for the lawmaking function of government. The fact that it didn't address administrative agency is quite understandable since no prosecution in the history of this country has ever existed for political speech in connection with an APA comment period. This has never happened before. It's never been targeted for criminal prosecution. And to go back to, I think, the Court's observation, if You know, in many ways, Section 1001 is really a bad statute. And we used to have in this circuit, as you're aware, the exculpatory no exception. And because of the clash with the Fifth Amendment, and someone like Martha Stewart gets convicted, turns out she didn't commit a crime, but being questioned, I don't know whether it was under oath or not, she gave some information that was apparently false. So, and in a sense, you know, she's trying to protect herself. It's a broad statute. And, you know, some people think it's a dangerous one. But, you know, there it is. And, you know, I challenge, well, but, you know, I have to follow the law, right? Yes, Your Honor. That's what they say. Mr. Mansfield, you have argued that the government may punish false speech to agencies if it occurs in the context of applications for contracts or for licenses. Now, why is this different here when what your client is seeking is to have the FDA not regulate them, and in which your client is in sole possession of the facts? But there's no opportunity for debate here on the part of the FDA. It is not in possession of facts with which to rebut. And so what your client is doing is seeking to influence the FDA and to steer it away from regulating them. Why isn't that similar to the licensing scheme? It's extremely different. Because in a licensing scheme, the agencies are acting based on specific information from an applicant for a particular commercial benefit or property right from the government. And the government does not solicit 15,000 comments from the wide-ranging public and engage in debate about whether this person is qualified. They have to look at the person's tax returns or their application. Sometimes they're certified, sworn, maybe not. But they look at that person's particular information for this particular commercial benefit. Here, we're talking about a proposed change in law, law that will, after public debate, result in a binding rule that binds the citizenry. There is a wide suite of public comment. But that may mean millions to your client if they have to obey new rules that they really don't want to follow. And now they're giving information to the FDA, suggesting to the FDA that there is no factual basis. And there are cases in administrative law that are well known in which agencies' rules were overturned because of a lack of evidence in the record as to the need for the rule. And so your client is building a record here that can get the FDA overturned on appeal. Yes. In this agency, the FDA is not a gullible patsy prone to be swayed by one of the members of the industry it intends to regulate. It is a highly expert agency with hordes of experts and its own research. But if we look at some of the statements by the government in this case, and if I could just have a moment to cite. There was really no need for your client to write any letters, was there? Well, I think there is a First Amendment right. Nobody asked them to write the letters. They could have just sat tight. Well, the government solicited comments from people interested in the proposed rule. Not specifically your client. It was not a personal invitation, but it's a public-wide national invitation to submit comments. We have First Amendment rights in this country to petition the government and be critical of proposed changes in the law. But I'd like to get back, and I need to give a few sites of record material that are not itemized in the brief, because they illustrate a significant point here. You have to write those down on a gum sheet. Yes, Your Honor. I'm not going to sit up here and take notes as you talk. I will write them down. That's why they have the gum sheet. When we talk about giving the government the power to select certain speech, political speech for prosecution, it ranges the dangerous specter of viewpoint discrimination. The government's unlikely to target folks who frankly support their proposed rules for false speech. And when we look at just the Federal Register, in this case, 62 Federal Register 30690, there's a statement by the government that could appear quite false and misleading. The government states, the available evidence strongly supports that adverse effects are caused by a Federal supplement. The GAO found that the material submitted and relied upon by the FDA did not show causation. In fact, the GAO found that the FDA didn't even do a causal analysis. Excerpt of record 0006. So are you suggesting they should sue themselves or? No, but what I'm saying is that there are statements made in the debate from a number of different speakers that can be viewed from this record where we sit as potentially false and misleading. Are they all going to be subject to multiple grand jury investigations? There's another statement by the government that I think is very important. At 62 Federal Register 30679, the government states there's a virtual absence of publicly available safety data on a Federal supplement, absence of publicly available safety data. If we look at page 30715 of the Federal Register 62, there are numerous references to human clinical studies, double-blind, randomized, placebo-controlled clinical studies that are published journals like the International Journal of Obesity that contain safety data. There are references in the Federal Register 105, 106, 108, 112, 113, 114, 115, 117, 118. Examples of publicly available safety data on a Federal supplement, the government said there's a virtual absence of it. Virtual, by the way, is one of the words that the government is challenging. I just want to stop you though. I mean, we might be, we must be talking across each other in some ways here because I am trying to understand your argument. And when I hear this, I think that goes to show whether or not something on the part of your client or anyone else was knowingly false if there's all this data to the contrary. And so isn't that a question of proof rather than permission to bring the prosecution? I keep kind of stumbling here as to the difference between what one would present in defense of the prosecution as opposed to why there should be no prosecution at all, because that to me doesn't bespeak why there should be no prosecution. It might just be poor charging judgment. But do you understand my question or my concern? I'm just trying to understand your point. I believe I do. I think that our position is that there can be no prosecution for political speech because these issues of falsity, whether they're perceived in the government statements or industry statements, are to be subject, as Klipper Express says, to the crucible of debate, not to criminal prosecution. Now, the government can prosecute political speech. It has the power to prosecute political speech if it meets the standard of demonstrating an overriding government purpose and a compelling justification and that that criminal prosecution, throwing people in jail for speaking out against government action, is the least restrictive means. They haven't met that standard. They haven't met the standard, and so they can't prosecute the speech. All right. We've let you go beyond your time. Any other questions? No. We'll give you a chance to come back. Thank you, Your Honor. If it may please the Court, I'm Phil Halpern. I'm speaking for the government, along with Kyle Hoffman from my office. Mr. Mansfield suggested that this is an example of the prosecution going off course. I would suggest it's the exact opposite. It's an example of a corporation going off course. What you are being asked to do here is not look at something that's unprecedented on the government side, but it's unprecedented on the Petitioner's side. There is a solid line of First Amendment precedent going back almost 100 years, nowhere is there any indication that a corporation can make a knowing and deliberate false statement in any context whatsoever. That being in a defamation context, that being in a commercial context, or that being in a political context, assuming, as the Petitioner does, that this is, in fact, a political statement. I think it's clear here also that without even having to reach this broad issue of whether the Court wants to look at is a knowing, deliberate false statement ever something that should be countenanced by the First Amendment, the type of speech that should, in fact, be countenanced because somehow it adds to the productive dialogue, we have to look at the context here, which, as the Petitioner has made clear, is to a Federal agency. It is indeed anomalous that a Federal agency that is being charged with protecting the health and safety of the American public can seek comment when it looks to adopt rules and regulations, whether it's 15,000, 1,500, or 15 comments, and it looks to these comments, as Petitioner concedes, in a manner that it has to rely on these comments, and that an individual or a corporation can then deliberately and knowingly come up with a plan to mislead that Federal agency to either get it to promulgate rules that are inaccurate or to get it to promulgate rules that don't apply to its particular product is absolutely, in my opinion, absurd. There's nothing in the case law whatsoever that suggests that this should be appropriate. Mr. Halpern, Mr. Mansfield suggested that one of the problems here might be viewpoint discrimination. What happens if the government decides only to prosecute those who make false statements to the FDA that oppose the rule, as opposed to those who have overstated the evidence that would support the rule, so that we only punish those who say there are no claims, there are no complaints about our product, and we don't punish those who say there are millions of claims out there against these health products? I would suggest that he's mixing apples and oranges, Your Honor. The reason I say that is because there are, in fact, very sound judicial doctrines to prevent the government from engaging in selective prosecution. However, I don't think you can use those arguments to try to bootstrap yourself into a viewpoint discrimination case. I think if you want to analyze it through the guise of viewpoint discrimination and analysis that I think would only be embarked on by the Court if they did find that this is some type of speech that is worthy of First Amendment protection. But if you did that, you'd have to start at the very beginning, and that would be looking in the words of Turner, R.A.V., at the exact statute. And to quote what the Court would say, the Supreme Court, the principal inquiry in determining neutrality would be whether the government has adopted a regulation of speech because of agreement or disagreement with the message it conveys. I think that's the starting point. One has to look at 1001 to decide if, in fact, that is the type of statute that is subject to being content-based and viewpoint-based. I don't believe we even get there. In Petitioner's papers, they just suggest that, well, obviously you have to look at the statute, and therefore you have content discrimination, although they don't go and make the next argument, which would be if there is content discrimination, is there the even more invidious form of viewpoint discrimination that the Court has always been vigilant to combat? But the mere statement that there was content discrimination, the government disagrees with entirely. We don't believe 1001 has ever been attacked for that. We don't see how it can be attacked for that. There's no question that the government did not adopt 1001 to suppress any type of individual idea. Unless you get to that point, you don't even enter the area of content or viewpoint discrimination whatsoever. If, in fact, the government is selectively prosecuting the tabloid, that's something that would be appropriate to attack on its face as a selective prosecution. I would suggest that it's quite clear that that's not the case here from, in fact, even the facts that Mr. Mansfield brought up. The government was, in fact, embarked on an investigation, and it was only because they were embarked on that investigation did this, in fact, when I say this, the fact of the potential false statements, obstruction of justice, perhaps some type of wider fraud engaged in by Metabolife come up. It was only because we did learn that, in fact, there was a knowing false statement of fact. At least, we believe we came up with that evidence. The district court, despite what Petitioner stated, made an actual finding on page 8 of their order that we did at least present evidence that demonstrated that there was a finding that there was falsity, a deliberate falsity on Metabolife's part for, and I'm quoting now, falsely describing the consumer health complaints it had received about Metabolife 356 in Metabolife's letters to the FDA. The court also found reasonable cause to believe that the president of the corporation and other employees were aware of the consumer health complaints that they had received that they didn't reveal. And let me ask you just the flip side that I asked them on the antitrust side. It seems kind of odd that in an antitrust context, you can petition a government agency, not just Congress, but any government agency, and to try to convince them to do something that would basically be illegal would give you a monopoly in the market. Why isn't this analogous where they're basically trying to convince an agency not to take this action? And in doing that, they're exercising basically their right to petition the FDA. So why isn't that an immunity zone? Well, I do think there is an area where you can analogize between the two cases, Your Honor, but I do think they're different. In fact, I think they're very different. The first thing I would point to that I would look at from analogy is what we're looking at here. And this is the area where conduct and speech overlap. And here we're moving into actual conduct as much as speech, which is one of the reasons why I believe it's so hard to give any type of First Amendment protection to this. Let's stop there. This statute doesn't prosecute conduct at all, does it? It prosecutes speech. Well, you know, again, there are indeed a number of statutes. 1001, I think, is the one that we're looking at. There are other ones that we may go after. But it's speech as conduct in a way, because the type of it's not just the knowing false statement, which is very important. And by the way, I think it's a distinction also with the antitrust cases that we have a knowing false statement. But it's a statement in a material matter that is being designed to mislead an agency. So it is a course of conduct that is being carried out through speech, much the way we had conduct in the Daley case, where we had an individual advocating setting up churches, arguing not political, but religious freedom. And in setting up these churches, it was later determined that the churches were simply another way to avoid taxes. By setting up these churches, the individuals didn't pay their taxes. Or the way you can have conduct and speech overlap in other instances, such as draft card burning, flag burning, in all of those instances, the Court has, in fact, not wanting to give any First Amendment protection to this. I don't think there's any conduct involved in Part 2 of Section 101. You have to make a materially false, fictitious, or fraudulent statement. As to that one, you're right. This is really the statute we're talking about. So I could understand if there were conduct-related, where we divide between conduct and speech. But it seems to me that, unless I'm missing something, wouldn't you agree that 101, that subpart 2, which we're talking about here, that really is pure speech? The question is, can you restrict it? Well, it's clearly pure speech. But is it, and I don't want to quarrel with the Court, but is it speech that, in essence, is really conduct? When you add the materiality element, which you have to add into it, it's the type of speech that has to attempt to mislead an agency on a, well, has to involve a material part of it. I mean, there is the intent here that they're trying to make these no-and-false statements in order to accomplish the goal of misleading the agency or getting what they want. And that's what it's going to do. That gets you back to that sounding more like political speech, because the reason they're trying to do this is they're trying to convince the government. They're basically petitioning the government, you know, some people want to kick it off the market, we want to keep it on the market, we want to tell you our reasons for keeping it on the market. You know, it may sound like political speech. It could sound like obscene speech or fighting word speech. It doesn't mean it's protected, Your Honor. When I look at the type of speech. Well, let's say that it is political speech. Okay. Okay. So if we were to determine that this petitioning here is not really, albeit in a rulemaking, is not really akin to adjudicative, and it's certainly not under the congressional legislature, but we said it's political speech, how then would we analyze it from your perspective? I think after that, the Court would first have to make a determination if this was the type of political speech that was worthy of protection. I think you'd have to look at the relevant case law in the Second, Fifth, and Sixth Circuit, all which has considered the issue of political speech. Most of the time it comes up in the context of campaign laws. That's just the most common way. It comes up under State law that way. I think there are 17 States that have statutes which prohibit false speech. All of the cases that have looked at it, contrary to what Petitioner might suggest, have uniformly found that there is no protection for a knowing false statement of fact. They have found it doesn't contribute. Those cases are cited in our brief. I would also suggest, Your Honor, that the Supreme Court, while it hasn't tackled this issue head on as we are right here, has certainly made clear in certain of its opinions how it feels about it. Certain cases that were cited by Petitioner, and I'm speaking of Meyer v. Grant and Brown v. Hartledge, are, in fact, very instructive. If you look at Meyer v. Grant, and that was a case that the Supreme Court struck down a provision of Colorado law which banned compensation of individuals who were circulating petitions. There was a – in Colorado they wanted to have a certain amendment and they had people gather petitions to see if they could fight that. And the – I believe it was a corporation paid people to do it, and that statute came under attack and the Supreme Court struck it down. But if you look at that case, in deciding that it was okay to strike down this law in that it didn't further the compelling State interest of keeping fraud out from the voter – voting process, the Court noted there were other sections of this exact same law which, in fact, guarded against that type of fraud. And I'm quoting now from the opinion on page 427. Other provisions of the Colorado statute deal expressly with the potential danger that circulators might be tempted to pad their position with false signatures. It is a crime to forge a signature on a petition, and they cite the statute. It is a crime, again, I'm quoting now, to make false or misleading statements relating to a petition, and then it cites that exact same statute. So there you can see, right here, in a case cited by Petitioner, the Court was confronted with a statute that made it a crime to make false or misleading statements in the same petition process. They had no problem with that, and, in fact, they cite that as approval in reaching their decision. And that's not the only Supreme Court case. Kagan. Let me ask you about Garrison, because the language in Garrison, if you kind of read it straight up, would seem to support your position, because they say it doesn't matter that you use it for political ends, if you're doing something that is basically a calculated falsehood, you kind of fall outside of the protection. But I think I heard Mr. Mansfield say that he didn't believe, in the context of an agency, that this kind of a defamation analysis would control. And so I'm interested in hearing from the government on that. I think that's an excellent question, Your Honor. And I think we have to start again from the point of that entire line of cases, Garrison, well, Tchaplinsky, Garrison, New York Times, and on and on. Every single one of these cases talk about knowing false statements or statements with actual malice, actually, in the defamation context. But they never limit it that way. They always talk, and the language you quoted, I believe, came from Tchaplinsky. They talk about even political speech is not, is subject to being regulated. And what I find so anomalous here is that the petitioner argues that the interest that the Supreme Court found to override the First Amendment in a person's reputation is somehow greater than the interest of a Federal agency that is designed to protect the health and safety of the American public, a Federal agency, in the context we're here, that is discussing promulgating rules because of their fear that people may be dying because of something that is sold by a petitioner. I would think that the interest that the agency has in getting truthful material that petitioner concedes they're going to rely on is equally great, if not far greater, than that in a person's reputation. And I don't mean to denigrate a person's reputation, but I think if you look at it across the board, I think that argument can be made, and I think it's a powerful one. And I think cases decided by this circuit and by the Ninth Circuit have, in fact, made that same point. The fact of the matter is, although this Court need not, and by no circumstance would I urge that the Court go into a test and look to see if, in fact, under a First Amendment test, you need to go into intermediate scrutiny or strict scrutiny. As I say, I don't believe the statutes are content-based at all. I just don't see that argument, and clearly there is wide support for passing any type of intermediate scrutiny test. But even if you looked at compelling interests, I think I should note that there are cases that make it clear that it's a traditional exercise of the government police powers to protect the health and safety of its citizens. Those cases are legion. This circuit says that public health and well-being have been recognized as compelling governmental interests in a variety of contexts. So I think not only is the argument made that the Supreme Court deliberately included a wide, broad-based denunciation of no and false statements, and by no means did they limit that to defamation. That was simply the context that came up. And as I said, I think there is Supreme Court precedent to suggest that they feel it's wider, but you still would have a very compelling reason in this instance to say, well, clearly it might be a more difficult case. And let's make it clear that the government has confined itself to certain statements, certain false statements of fact, in what clearly is a larger universe of statements, statements not only in these letters, but statements on TV to the public in general. I think if the government came in front of you and said, well, we would like a wider fraud case here based on what Metabolite said that went into the Federal Register that the public might have relied on or what they said in newspaper airs or TVs, you know, then you might have different issues if those statements were made, not for commercial reasons solely, but even if they were made because they were trying to fight the promulgations of these regulations, which would have acted adversely against their own. Well, I think that's one of the points they made was that this isn't narrowly tailored. And I could see this coming up in an environmental context, for example, where there's disagreement about whether something is toxic or affects the environment and somebody is petitioning the EPA to say, you know, don't impose those restrictions. Doesn't this, doesn't it really chill political speech or speech in terms of petitioning the government if you know that everything you submit is all of a sudden under, you know, the Federal Register becomes the blueprint for prosecution? I would strongly urge that wasn't the case. Judge Bybee asked a question, I believe, earlier to Mr. Mansfield about whether this would matter if it was under oath or not under oath. Well, frankly, I don't think it does because I think clearly the petitioner was on notice that they could not make false statements. Not only were the statements made, they were made through attorneys that were submitted in letters opposing these regulations that they had a very strong economic interest in, and they made these in an attempt to have the agencies rely on those. Clearly, that's not the type of conduct or speech, whichever way you look at it, that merits any protection whatsoever. It's the type of conduct that I believe is to be condemned, and certainly it's the type of conduct that is subject, if true, and again, we're assuming it's true, but if true, that is subject to political prosecution. Mr. Halperin, is the – before you sit down, is the term serious adverse event, is that a technical term, is that a term of art? It is, and we define serious adverse event. It's not only serious adverse events because there are statements also that were made in the letters that just talked about adverse events. And in that regard, I think it's important for the Court to note also that – But adverse event is a defined term in the FDA. How about serious adverse event? Yes. What's the difference between a serious adverse event and an adverse event? Yes. And they're both – What's the difference between those two? One is simply more serious. We cited them in our brief, Your Honor, and a serious adverse event, I think the common ones are heart attack, stroke, seizure, and any event causing hospitalization. The less serious adverse events are headache, nausea, et cetera, and those are listed in our brief, and they are listed in the Federal Register as well. So it should – you believe that it should have been clear to Doe as to which – or to the Corporation as to which events – which reports that it received should have been – were classified as serious and which were not classified as serious? Absolutely. I think in terms of the types of adverse events that we put in our submission, I think it's clear that the Court can see which ones of these are serious and which ones of these aren't. And I might add that it's important for the Court to recognize also that it's not the FDA definition itself that is critical, but it's the Petitioner's understanding. And we presented a great deal of evidence, and the district court found that we did in fact show reasonable cause to believe that Metabolite knowingly made false statements regarding these points. So this wasn't a question of a mistake by them. I mean, there's evidence to show this was a knowing and deliberate false statement. And clearly, there's no type of ambiguity in the Cullivan sense in either the Federal Register or any of the definitions that have been used. Indeed, Metabolite's own experts have reviewed the reports, and they've conceded, you know, there were a large number of serious adverse events as well as a large number of adverse events. So there's been concessions about this, although clearly on some of the outliers in the definition, there could have been some questions where some, you know, less serious ones might have slipped over. But that's a far cry from the facts that we're presented with and that we put in our submission to the court and that the district court examined. Thank you. Thank you. Rebuttal? I'll give you a couple of minutes. Thank you, Your Honor. Just a couple of brief points. On the last point in response to Judge Bybee's question, I would respectfully disagree with what the prosecutor urged about the definition for serious adverse event report. It is – there is no singular definition for it. It is troubled by ambiguity. The government conceded below in its papers that there were multiple definitions for the phrase. There is no regulatory definition for this industry, the dietary supplement industry, for the phrase adverse event report or serious adverse event report. Indeed, all of these matters were up for debate in connection with the proposed reg. There was no definition for it at the time that these challenge statements were made, and that was incorrect. And on the last point on this – But there is now. But there is now. I actually don't know as we stand here today the current status of it, but certainly there was none at the time that the challenge statements were made. The last point on this definition, the GAO found not just imprecision but ambiguity in effect in the way in which this word and this phrase, serious adverse event, was used, even with knowledgeable medical experts. Put aside ordinary citizens with varying degrees of education, there was room for imprecision and room for subjective opinion with the FDA's experts. So that was a huge problem and something that, frankly, needed refinement as a result of the crucible of debate. But your client did use – it did parrot back the language that the FDA was using. In other words, it parroted back technical language or terms of art in the FDA. They may have – as imprecise as they may have been, your client might have chosen some other language, but it was using the language of the FDA. It was using words that the government used in connection with its side of the debate. But the government can't impose particular definitions on speakers in a political debate. Every citizen is entitled to infuse the words they utter with their own subjective meaning. That's what free speech rights are all about. And the problem in this case – Well, that's a little bit of Alice in Wonderland approach, Counselor. If we can't – if everybody gets to put their own subjective terms in it, then we can't rely on what anybody says. It's not Alice in Wonderland. It's part of what we have called the profound national commitment in uninhibited, wide-open debate. That's what it is. And what happens when prosecutors are allowed to target undefined words and launch grand jury investigations, it has an immediate chilling effect on all of those who may want to speak in the future. If after – with respect to future comments, period, do we want citizens to respond by saying, you know, I respectfully decline to comment on a proposed change in the law on the grounds that it may tend to incriminate me, that's antithetical to the First Amendment. It's antithetical to political debate. It's antithetical to the First Amendment right to petition your government, express your own subjective views about what's right or what's wrong, and to define the words with respect to your subjective meaning, and not to have the government launch specific targeted investigations of opponents which have immediate ramifications. They subpoenaed all the lawyers from two national law – not all the lawyers, but many of the lobbying lawyers from two national law firms. They've disabled the company's ability to participate further in the debate. These lawyers now are getting counsel. They're dealing with issues of the Fifth Amendment and all the other kinds of issues that have to be addressed in connection with a criminal investigation. All of this immediately flowing from this type of criminal investigation, and it's simply not permitted. I'm pleased that the government raised the Meyer case, because very briefly, the Meyer case – You want to wrap it up? Your time has gone way over. Thank you, Your Honor. The Meyer case involved an application of strict scrutiny, which is all we're urging here. The government wants to prosecute false political speech, meet the constitutional burden. They failed to do that. And lastly, 119, vote no, is in fact the case that finds that prosecutions for false campaign statements are unconstitutional in the First Amendment. It was inaccurate to suggest all of the cases agree with the government on that. 119, vote no. That's a Washington State case? Yes. Justice Sanders for Washington Supreme Court. Thank you, Your Honor. All right. Thank you. And we're no longer closed. We're going to get the other case in here, aren't we? All right. All right. Go thou and sin no more. All right. We need to call the other people in, huh? Yeah. What? Right. OK. Well, you know what Dickens said, the overriding principle of the English law is to always keep yourself in business. That's what's happening. I mean, now they have to go get, each lawyer has got to get a lawyer. They have to investigate. They have to know. That's the gross national product. And. All right. All right. We're on the U.S. versus Lucio Ambrose Gonzalez. All right. Both counsel are present. Mr. Curnow is here representing the, is an assistant U.S. attorney from San Diego. And Mr. Timothy Scott is here as well. All right. You're the appellant. Thank you, Your Honor. Good morning, Your Honors. Timothy Scott on behalf of the appellant, Mr. Ambrose Gonzalez. May it please the Court. Your Honor, there are three primary reasons why we're asking.
judges: Pregerson, McKeown,bybee